UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────

B.U.S.A. CORP. and ROBERT TEMKIN
ASSOCIATES,
    **Plaintiffs,**

v.

ECOGLOVES, INC. and LYNN RILEY,
    **Defendants.**

───────────────────────────────

05 Civ. 9988 (SCR)

MEMORANDUM
DECISION AND ORDER

**STEPHEN C. ROBINSON, District Judge:**

  Plaintiffs ask this Court for a preliminary injunction against Defendants. For the reasons set forth below, Plaintiffs' motion is granted.[1]

## I. Background

  B.U.S.A. Corp. ("BUSA") and Robert Temkin Associates ("RTA") (collectively "Plaintiffs") engage in the creation and distribution of inserts and accessories, primarily instruction manuals, applicators, gloves, brushes, and other items that are designed to help consumers apply a particular cosmetic product, including hair dye.[2] Plaintiffs gain customers through a bidding process. After a potential customer gives Plaintiffs specifications for a product, Plaintiffs develop a bid by consulting their cost specifications/price formulae, which include profit margins and shipping, manufacturing, and labor costs. Once a customer chooses Plaintiffs to provide the product, Plaintiffs turn to outside manufacturers to produce the product. Plaintiffs also improve existing products and develop additional products for current and potential customers.

---

[1] The following findings of fact and conclusions of law are made on the current state of the record and are limited to this motion.
[2] Robert Temkin owns Plaintiffs.

1

Defendant Lynn Riley worked for RTA for approximately five years in a management position. At least part of her responsibilities at RTA involved actively managing Plaintiffs' accounts.[3] As a result, she was aware of Plaintiffs' pricing structures and bidding information and was engaged in customer development.

Ms. Riley resigned from her position at RTA on June 6, 2005. The next day, she formed Defendant Ecogloves, Inc. ("Ecogloves") (collectively "Defendants"), a business, like Plaintiffs, that engages in the creation and distribution of inserts and accessories. While Ms. Riley formed Ecogloves on June 7, 2005, she registered the domain name "www.ecogloves.com" on August 14, 2004, almost one year earlier. Not only are Defendants in the same industry as Plaintiffs, and, therefore, directly compete with them, but Defendants advised Plaintiffs' contacts at Plaintiffs' customers that Defendants were interested in bidding on various opportunities. For example, while working for Plaintiffs, Ms. Riley was involved with the development of a brush for L'Oreal, and on or prior to June 14, 2005, Ms. Riley began to solicit bidding on that same brush for her newly established company, Ecogloves.

Plaintiffs now seek a preliminary injunction preventing Defendants from engaging in particular acts and ordering Defendants to return Plaintiffs' property.[4]

## II. Discussion

"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make

---

[3] Ms. Riley was involved, at least in part, with Plaintiffs' accessory and hair coloration industry accounts.
[4] The parties dispute whether Ms. Riley is in possession of any of Plaintiffs' property.

2

them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)).

### A. The Merits of Plaintiffs' Claims

Plaintiffs allege that they are likely to succeed on at least two of their claims: (1) misappropriation of trade secrets; and (2) tortious interference with a contract.[5] This Court finds that Plaintiffs have shown sufficiently serious questions going to the merits to make these claims a fair ground for litigation plus a balance of hardships in Plaintiffs' favor.

#### 1. Misappropriation of Trade Secrets

"To succeed on a claim for the misappropriation of trade secrets under New York law,[6] a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) (citing *Hudson Hotels Corp. v. Choice Hotels,*

---

[5] Plaintiffs also argue that they are likely to succeed on their claim that Defendants violated the Computer Fraud and Abuse Act (CFAA). 18 U.S.C. § 1030. While the CFAA is a criminal statute, it provides for a civil right of action. 18 U.S.C. § 1030(g). Because section 1030(g) limits civil actions to conduct that involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of section 1030(a)(5)(B), this Court cannot grant a preliminary injunction based on Plaintiffs' claims under sections 1030(a)(2)(C) and (a)(4). Thus, Plaintiffs' only viable claim is under subsection 1030(a)(5)(B)(i). However, damages for a violation of subsection 1030(a)(5)(B)(i) are limited to economic damages. *Id*. Because Plaintiffs' recovery is limited to economic damages, this Court cannot grant injunctive relief. *See Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.").
[6] The parties agree that this Court must apply New York law in adjudicating Plaintiffs' state law claims.

*Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993), *abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2nd Cir. 2000)).

### a. Trade Secrets

A trade secret "is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b (1939)). To determine what information constitutes a trade secret, New York courts consider:

> '(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'

*North Atlantic Instruments, Inc.*, 188 F.3d at 44 (quoting *Ashland Management, Inc. v. Janien,* 82 N.Y.2d 395, 407 (1993)).

Plaintiffs allege Defendants misappropriated three different types of trade secrets: (1) cost structures and bidding information; (2) customer lists and customer information; and (3) prototypes and particular products. This Court finds that Plaintiffs' cost structures, bidding information, and customer lists are trade secrets.

### i. Cost Structures and Bidding Information

Plaintiffs argue that their cost structures and bidding information meet the six factor test described above. They assert that both types of information are "the product of revisions and refinements over many years of hard work at considerable expense." (Pl.'s Mem. at 17.)

According to Plaintiffs, their cost structures are a "sophisticated calculation" that includes the costs of overhead, development, freight, and other anticipated costs. *Id*. Plaintiffs further allege that if a customer knew about the cost structure it could demand lower prices and if a competitor knew about the cost structure it could slightly underbid Plaintiffs. Accordingly, Plaintiffs argue, they have "undertaken substantial effort to conceal the cost structure" and most individuals within Plaintiffs' business do not know the cost structure for each product. *Id*. at 18. By using its cost structure, Plaintiffs are able to prepare individual bids for each customer. Plaintiffs do not generally publish their bids – only Plaintiffs and the customer who received a bid know about the bid.

Defendants argue, however, that most of Plaintiffs' cost structures did not "radically" differ from those used by competitors. (Def.'s Mem. at 4.) They further argue that Plaintiffs' have not identified specific efforts that they have taken to conceal their cost structures. Finally, Defendants assert that bids are "not 'the product of revisions and refinements over many years of hard work'" as each bid is prepared on a project-by-project basis. *Id*. at 5 (quoting Pl.'s Mem. at 17).

Plaintiffs have sufficiently established that their cost structures and bidding information are a trade secret. Not only do customers and others outside Plaintiffs' businesses not know the cost structures and bidding information, but many of Plaintiffs' employees are not privy to such information. While the customer receiving the bid knows

5

about the bid, it is still not aware of the cost structure and other confidential information used to develop the bid. Plaintiffs sufficiently protect their cost structures and bidding information as they limit the number of employees that have access to such information. Each cost structure and piece of bidding information is valuable to Plaintiffs as it enables them to realize a reasonable return on their investment while providing customers with a service and price that are acceptable to them. If a customer were to learn the details of Plaintiffs' cost structure or bidding information for a certain product, customers could use such information to demand concessions, reducing Plaintiffs' profit. Further, Plaintiffs have expended significant effort in developing a cost structure and bidding information for each product. While each individual bid may not have taken years to develop, certainly some of the information that informed the development of Plaintiffs' cost structure and of each bid has been cultivated over years of work. Finally, it would be difficult for anyone other than Plaintiffs or specific employees of Plaintiffs to duplicate a particular cost structure or bidding information as a variety of factors are involved, many of which only Plaintiffs or specific employees of Plaintiffs would have access to. *See Unisource Worldwide, Inc. v. Valenti*, 196 F.Supp.2d 269, 278 (E.D.N.Y. 2002) (finding, after considering the six factors, that "knowledge of a customer's needs and specifications and the prices charged to that customer" is a trade secret).

                ii. Customer Lists and Customer Information

Plaintiffs next argue that their customer lists and information about customers' specifications and preferences are trade secrets. Defendants argue that Plaintiffs' customer lists are not trade secrets because anyone could easily go to one of Plaintiffs'

customer's websites and determine how to become a vendor. Defendants further argue that Plaintiffs' have not identified specific efforts that they have taken to conceal their customer lists.

This Court finds that Plaintiffs' customer lists are trade secrets to the extent that the lists include specific contact information for individuals who are employed by Plaintiffs' customers that is not readily available to individuals making normal business inquiries to Plaintiffs' customers. The identities of Plaintiffs' customers, however, are not trade secrets. Further, information about a customer's specifications and preferences is not a trade secret.

"'A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable.'" *North Atlantic Instruments, Inc.*, 188 F.3d at 44 (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985). When, however, customers are readily ascertainable "as prospective users or consumers of the . . . services or products, trade secret protection will not attach . . . ." *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392 (1972).

For the purposes of this preliminary injunction motion, this Court finds that the names of Plaintiffs' customers, which are all companies, are not a trade secret, however, the names of the specific contacts at those companies are trade secrets. *See North Atlantic Instruments*, 188 F.3d at 44-45 (upholding a magistrate judge's finding, for the purposes of a preliminary injunction, that the plaintiff's customer list was not a trade secret to the extent that contained the names of companies, but the identities of the individual contact

people at those companies was a trade secret because the information on the specific contact people was not readily available to others in the industry; the plaintiff took numerous measures to protect that information; and the defendant could only reproduce the client list with great difficulty). The names of Plaintiffs' customers, including Proctor & Gamble, L'Oreal, and Clairol, are not a trade secret as these companies are readily ascertainable as prospective users of Plaintiffs' and Defendants' products and services. *See Leo Silfen, Inc.*, 29 N.Y.2d at 392. However, the contacts at those companies are a trade secret as this information meets the six factor test. First, the identity of the contacts who work for Plaintiffs' clients is not common knowledge and the relationships with those individuals have been developed over many years.[7] Second, such contact information is not commonly known to all of Plaintiffs' employees. Third, Plaintiffs took appropriate measures, such as locking files and using computer passwords, to protect the contact information. Fourth, the identity of their clients' contacts is valuable as they have used substantial resources to develop relationships with the particular contacts. Finally, contrary to Defendants' assertions that appropriate contacts can be found on the customers' websites, the identities of the individual contacts are not on the websites and cannot be easily acquired or duplicated by others. Thus, Plaintiffs have demonstrated that their customer list is a trade secret to the extent it contains the identities of the individual contact people who work for Plaintiffs' customers, but not to the extent that it contains the names of the companies.

Even if Ms. Riley has such contact information committed to memory – Defendants assert that she does not have a written list while Plaintiffs assert that she does – the information about the contacts who work for Plaintiffs' customers is still a trade

---

[7] Defendants conceded this at oral argument. (Tr. at 13.)

secret. Whether information is part of a person's casual memory is not determinative of whether something is a trade secret.[8] In *North Atlantic Instruments*, the Second Circuit noted that *Leo Silfen, Inc.* "suggest[s] that one factor in analyzing a trade secret claim against an employee who has solicited a former employer's customers is whether the solicitation was merely 'the product of casual memory.'"[9] 188 F.3d at 46 (quoting *Leo Silfen, Inc.*, 29 N.Y.2d at 391). The court expressly noted that that *Leo Silfen* does not "describe a broad rule dictating that anything an employee remembers casually is not a trade secret." *Id.* at 46-47; *see also* Roger M. Milgrim, 4-15A Milgrim on Trade Secrets 1 (2005) ("The weight of authority is that an appropriation by memory will be proscribed under the same circumstances as would a similar appropriation via a more tangible means.").

Defendants argue that if a customer list is a product of casual memory, a former employee can use that list in the absence of a restrictive covenant and cite *Metal & Salvage Ass'n, Inc. v. Siegel*, 121 A.D. 2d 200 (N.Y.A.D. 1986), a one-page opinion from the New York Appellate Division for support. Defendants, however, misread the case and rely entirely on one misleading sentence. In *Metal Salvage*, the court found that the defendants could solicit the plaintiff's customers because the customer list was not a trade secret, it was a part of defendants' casual memory, and there were no restrictive covenants. *Id.* at 201. Thus, the case comports with the uncontroversial proposition that a defendant can use a customer list that is not a trade secret unless the parties have entered into a restrictive covenant. *See Catalogue Service of Westchester, Inc. v. Henry*, 107 A.D.

---

[8] At this stage of the proceedings and on the current state of the record, this Court cannot determine whether this information, if it is memorized, is a part of Ms. Riley's casual memory.

[9] In *Leo Silfen, Inc.*, the New York Court of Appeals held that no trade secret protection was warranted where the plaintiff's customers were likely users of the merchandise and engaged in business at advertised locations. 29 N.Y.2d at 388.

2d 783, 784 (N.Y. App. Div. 1985) ("It is basic law that absent a covenant not to compete . . . , an employee is free to compete with his or her former employer unless trade secrets are involved . . . .").

Plaintiffs also argue that information about a customer's preferences and specifications is a trade secret. Defendants, however, argue that customers' specifications are not trade secrets because each company provides its specifications to obtain as many bids as possible during the bidding process.

Plaintiffs have not established that information about a customer's preferences and specifications is a trade secret. Plaintiffs only assert that the customers seek to keep such information confidential from the customers' competitors. Thus, Plaintiffs have not set forth sufficient information to meet the six factor test.

### iii. Prototypes and Particular Products

Finally, Plaintiffs argue that they have developed certain products and business methods – for example, folding the user manual around the latex glove to reduce costs and increase efficiency – that are trade secrets. On the current state of the record, Plaintiffs do not meet the six factor test. Thus, they have not established that their prototypes and particular products are trade secrets.

### b. Confidential Relationship

As discussed above, to prevail, Plaintiffs must establish that (1) that it possessed a trade secret, and (2) "that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North*

*Atlantic Instruments, Inc.*, 188 F.3d at 43-44. "Both this Circuit and numerous New York courts have held 'that an agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal.'" *Id.* at 47. Moreover, this duty "exists as well after the employment is terminated as during its continuance." *Id.* (quoting *ABKCO Music Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983)). Thus, under New York law, a former employee cannot use trade secrets in competition with his or her former employer. *Id.* at 49.

Ms. Riley worked for RTA for approximately five years. The day after resigning from RTA, Ms. Riley formed Ecogloves, Inc. "to develop and create variations of [the types of packaging sold by RTA] for items used in several industries." (Def.'s Aff. at 3.) Because Ms. Riley is in direct competition with Plaintiffs, she cannot use any trade secrets she learned while working for RTA to further Defendants' interests.

Plaintiffs argue that Ms. Riley used the above trade secrets to compete directly with Plaintiffs. Specifically, they allege that she has submitted lower bids to previous customers of Plaintiffs and used Plaintiffs' customer lists to contact Plaintiffs suppliers and customers.

Defendants only respond by arguing that Ms. Riley did not enter into any non-compete agreements or otherwise restrict her ability to compete with Plaintiffs. Defendants' argument is unavailing. As noted above, a plaintiff can establish that a defendant "used that trade secret in breach of an agreement, confidential relationship *or* duty, or as a result of discovery by improper means." *North Atlantic Instruments, Inc.*, 188 F.3d at 43-44 (emphasis added). The use of the word "or" means that a defendant can misappropriate a trade secret without having entered into a confidentiality agreement.

Moreover, Defendants conceded at oral argument that Ms. Riley owed a fiduciary duty to Plaintiffs. (Tr. at 12-13.)

This Court finds for the purposes of this motion that Plaintiffs have established serious questions going to the merits of Plaintiffs' claim that Defendants misappropriated Plaintiffs' trade secrets. Defendants are in direct competition with Plaintiffs and have approached some of Plaintiffs' customers. Further, during oral argument, Defendants conceded that Ms. Riley used contact information for Plaintiffs' customers that she acquired while working at RTA. (Tr. at 13.)

*2. Tortious Interference with a Contract*

Not only are there serious questions going to the merits of Plaintiffs' claim that Defendants misappropriated trade secrets, there are also serious questions as to whether Defendants are liable for tortious interference with a contract.

There are four elements of tortious interference claim under New York law: "(a) that a valid contract exists; (b) that a third party had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001).

Plaintiffs argue that they meet the requirements of a tortious interference claim. First, Plaintiffs assert that they had a contract with Clairol to provide accessories and inserts to Clairol's Nice and Easy Products. Second, Plaintiffs assert that Ms. Riley knew about the contract because she was the account manager for the contract. Third, Plaintiffs allege that Clairol sought a price adjustment and lead time guarantee from Plaintiffs, but

Ms. Riley refused to lower the price or guarantee a lead time. Plaintiffs claim that had Ms. Riley notified them, they would have accommodated Clairol's request. Plaintiffs further allege that Ms. Riley refused the price adjustment or guaranteed lead time so that her soon to be established company, Ecogloves, could bid on that business. Fourth, Plaintiffs assert that as a result of Ms. Riley's refusal, Clairol put the contract out for re-bidding. Plaintiffs claim that they lost the income from the account, and their reputation and goodwill was damaged.

Defendants do not address any element of this claim.

Plaintiffs have established that there are at least serious questions going to the merits of their tortious interference claim. Plaintiffs had a contract with Clairol, and Ms. Riley was in charge of the contract. Ms. Riley had a fiduciary duty to Plaintiffs to act in their best interests while she dealt with Clairol. By acting in the best interests of Ecogloves, and not in Plaintiffs, Ms. Riley arguably became a third party who intentionally and inappropriately procured the breach of Plaintiffs' contract with Clairol. After Ms. Riley left RTA, Clairol sought bids to replace Plaintiffs. Defendants then submitted a bid to Clairol. After the bidding, Plaintiffs did not retain their contract with Clairol. Moreover, in their answer, Defendants admitted that "[a]s a result of Defendant Riley's actions, Plaintiffs were unable to retain their client account with [Clairol]." (Pl.'s Compl. ¶ 68; Def.'s Answer ¶ 68.) This series of events and Defendants' admission raise, at minimum, serious questions as to whether Ms. Riley intentionally procured the breach of Plaintiffs' contract with Clairol and, therefore, tortiously interfered with the contract.

### B. Irreparable Injury

"To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of monetary damages. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)).

Plaintiffs argue that they have established irreparable injury because they have shown that Defendants have misappropriated trade secrets. Defendants, however, do not address whether Plaintiffs will suffer irreparable harm.

This Court finds that Plaintiffs will suffer irreparable harm from the misappropriation of trade secrets. The Second Circuit has held that "'loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever.'" *North Atlantic Instruments, Inc.*, 188 F.3d at 49 (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam)); *see also Lumex, Inc. v. Highsmith,* 919 F.Supp. 624, 628 (E.D.N.Y. 1996) ("It is clear that irreparable harm is presumed where a trade secret has been misappropriated.").

### C. Balance of Hardships

Because this Court has determined that there are serious questions going to the merits of two of Plaintiffs' claims, it must also determine whether the balance of hardships favors Plaintiffs or Defendants.

In balancing Plaintiffs' harm from the denial of a preliminary injunction against any harm Defendants may suffer from granting the injunction, this Court finds that the balance favors issuing the injunction. This injunction will prevent Defendants from

misappropriating trade secrets or destroying Plaintiffs' property, which they cannot do regardless of the injunction. In fact, during oral argument, Defendants conceded that they would agree to all but one of the provisions of the preliminary injunction. The only provision that would put any measurable burden on Defendants – the only provision that Defendants objected to – is the prohibition on Defendants from soliciting business regarding any accounts held by Plaintiffs with L'Oreal and/or Proctor & Gamble involving gloves, inserts, or other hair color accessories. While this does prevent Defendants from soliciting some business, Defendants are still able to approach L'Oreal and Proctor & Gamble for other products. Defendants are also free to approach other companies for any product, including the gloves, inserts, or other hair color accessories. On the other hand, if this Court did not grant the preliminary injunction, the harm to Plaintiffs would be irreparable as Defendants would be allowed to unfairly compete with Plaintiffs.

### III. Conclusion

For the reasons discussed above, Plaintiffs' motion for a preliminary injunction is granted. Accordingly, Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them are hereby enjoined and restrained from:

(1) discussing or disclosing any details concerning Lynn Riley's employment with the Plaintiffs, including, but not limited to, the identity of Plaintiffs' suppliers, the

cost structure of Plaintiffs' goods, the specifications of Plaintiffs' goods, and the prices for Plaintiffs' goods;[10]

(2) misappropriating or using any of Plaintiffs' trade secrets as set forth above,[11] and to prevent potential misappropriation, soliciting business regarding any accounts held by Plaintiffs with L'Oreal and/or Proctor & Gamble involving gloves, inserts, or other hair color accessories;

(3) misrepresenting that Defendants have access to and can use Shengda and Poseidon, two of Plaintiffs' suppliers located in China, for production of goods or Plaintiffs' manufacturing processes and, if Defendants have access to either supplier, misrepresenting for what purpose Defendants have access to and can use Shengda and Poseidon;[12] and

(4) destroying, altering, or removing any of Plaintiffs' books and records, including, but not limited to, invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, insurance policies, shipping labels, and tax returns, including all records stored on computer disks or tapes or within computer terminals, hard drives, servers, or other computer storage devices, which contain any information whatsoever concerning the business or finances of any of Plaintiffs' or otherwise reflect transactions of any kind involving the sale of Plaintiffs' goods or goods colorably similar to Plaintiffs' goods.[13]

---

[10] At oral argument, Defendants conceded to this provision. (Tr. at 15-16.)
[11] At oral argument, Defendants conceded to this provision without conceding what Plaintiffs' trade secrets were. (Tr. at 16-17.) As discussed at oral argument, subject to the remainder of the preliminary injunction, Defendants may contact Plaintiffs' customers by using the channels that someone without knowledge of Plaintiffs' contacts would use. Defendants must document what they do and who they contact. If Defendants, through this process, end up speaking to one or more of Plaintiffs' contacts, Defendants will not violate this Order. (Tr. at 20-21.)
[12] At oral argument, Defendants conceded to this provision. (Tr. at 17.)
[13] At oral argument, Defendants conceded to this provision. (Tr. at 17.)

Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them are further ordered to return to Plaintiffs any items given by Plaintiffs to Lynn Riley during her employment by Plaintiffs and any items within Defendants' possession, custody, or control regarding, concerning, referring to, or discussion Lynn Riley's employment by Plaintiffs, including but not limited to, any prototypes, compact disks, computers, emails (printed or in digital form), business cards, correspondence, files, contact information, memoranda, reports, invoices, and product samples within five (5) days of this order by sending such materials via Federal Express to Matthew C. Wagner, 80 South Highland Avenue, Ossining, NY 10562.[14]

Additionally, Plaintiffs are granted expedited discovery. Thus, discovery may commence upon execution of this Order. Notice to any Defendant of her/its deposition on four (4) business days notice shall be deemed reasonable notice and responses to any duly served interrogatories or document requests under Rule 33 or 34 shall be made within fifteen (15) business days, rather than the thirty (30) days set forth under each Rule.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs shall file a bond with the Clerk of the Court in the amount of one hundred thousand dollars ($100,000.00) that will be given to Defendants should it be determined that Plaintiffs are not entitled to the relief set forth in this Order.

IT IS SO ORDERED.

_____
Stephen C. Robinson, U.S.D.J.

Dated: White Plains, New York
          January 31, 2006

---

[14] At oral argument, Defendants conceded to this provision. (Tr. at 17.)