UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
B.U.S.A. CORP. and ROBERT TEMKIN     :
ASSOCIATES,                          :
                                     :        05 Civ. 9988 (JSR)
              Plaintiffs,            :
                                     :        MEMORANDUM ORDER
         -v-                         :
                                     :
ECOGLOVES, INC. and LYNN RILEY,      :
                                     :
              Defendants.            :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.


        This action – which was reassigned from the Honorable Stephen

C. Robinson to the undersigned on June 5, 2009 – centers around

allegations that defendant Lynn Riley, a former employee of

plaintiffs B.U.S.A. Corp. ("B.U.S.A.") and Robert Temkin Associates

("RTA") misappropriated trade secrets from B.U.S.A. and RTA and then

went on to wrongfully compete with them after forming her own

company, defendant Ecogloves, Inc. ("EcoGloves").  Plaintiffs are in

the cosmetics supply business; among other things, they supply gloves

and other accessories that are inserted into hair coloring kits sold

by cosmetics companies.  Riley worked as a business manager for

plaintiffs, overseeing the glove supply part of RTA's business, from

1999 until June 2005, when she resigned and went into business for

herself.  In their complaint, filed in November 2005, plaintiffs

assert five state-law and two federal-law claims arising out of these

events.  Specifically, plaintiffs state claims for 1) violation of

the federal Computer Fraud and Abuse Act ("CFAA"); 2)

misappropriation of trade secrets; 3) tortious interference with

contract; 4) tortious interference with a business or economic opportunity; 5) breach of fiduciary duty; 6) deceptive business practices; and 7) civil damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO").

At the same time that they filed their complaint, plaintiffs moved for a preliminary injunction prohibiting defendants from, <u>inter alia</u>, disclosing certain trade secret information and soliciting business from any of plaintiffs' customers.  Judge Robinson granted that motion by Memorandum Decision and Order dated January 31, 2006. After discovery, the parties cross-moved for summary judgment in July 2007.  Specifically, plaintiffs moved for summary judgment in their favor on their state-law claims for misappropriation of trade secrets, breach of fiduciary duty, and tortious interference with a business opportunity.  Defendants, for their part, moved for summary judgment in their favor on plaintiffs' two federal-law claims and further moved for dismissal of plaintiffs' remaining state-law claims.  Before these motions could be resolved, defendant Riley entered personal bankruptcy, but the automatic stay imposed under 11 U.S.C. § 362 was lifted as to this case by the bankruptcy court by order dated December 23, 2008, <u>see</u> Ex. A to Notice of Filing Order Granting B.U.S.A. Corp. and Robert Temkin Associates Relief from the Automatic Stay.[1]  For the reasons stated below, the Court now grants

---

[1] In addition, defendants' counsel was granted permission to withdraw after defendants failed to make payments to counsel for a full year.  <u>See</u> Order dated July 22, 2008.

defendants' motion to dismiss plaintiffs' federal-law claims, declines to exercise jurisdiction over plaintiffs' remaining state-law claims, and therefore dismisses the case.

Both RTA and B.U.S.A. are wholly owned and controlled by Robert Temkin.  Defendants' Rule 56.1 Statement ("Def. 56.1") ¶ 1; Plaintiffs' Rule 56.1(b) Opposition to Defendants' Rule 56.1(a) Statement ("Pl. Opp. 56.1") ¶ 1.[2]  While the specifics of their respective businesses are disputed, <u>see, e.g.,</u> Def. 56.1 ¶1; Pl. 56.1 ¶ 1, it appears that RTA works with manufacturers – although the issue of whether plaintiffs have an exclusive relationship with any of these manufacturers is, again, disputed, <u>see, e.g.,</u> Def. 56.1 ¶¶ 22-23; Pl. Opp. 56.1 ¶¶ 22-23 – to create gloves and other hair color accessories for such clients as L'Oreal and Proctor and Gamble (and its subsidiary Clairol), Def. 56.1 ¶ 6; Pl. Opp. 56.1 ¶ 6.  The accessories are ultimately inserted into hair dye kits that are sold to the public.  Plaintiffs' Rule 56.1 Statement of Material Facts in Support of Their Motion for Summary Judgment ("Pl. 56.1") ¶ 2; Defendants' 56.1 Response and Counterstatement to Plaintiffs' Statement of Facts ("Def. Opp. 56.1") ¶ 2A.

---

[2] Plaintiffs, in their opposing 56.1 statement, assert that they dispute the substance of paragraph 1 of defendants' 56.1 statement, <u>see</u> Pl. Opp. 56.1 ¶ 1.  However, what they denominate a dispute over an issue of fact largely consists of a dispute over the characterization of certain basic facts and over other extraneous issues.  This pattern is repeated throughout both parties' opposing 56.1 statements.  When no assertion contradicting a basic fact is presented in a party's opposing 56.1 statement, the Court has taken that basic fact as undisputed.  Here, there is no real dispute that Temkin owns both plaintiff companies.

In 1999, defendant Riley was hired by RTA as a business manager overseeing the "glove part" of RTA's business.  Def. 56.1 ¶ 3; Pl. Opp. 56.1 ¶ 3.  The responsibilities of her job included submitting bids to customers such as Clairol, see Pl. 56.1 ¶ 39; Def. Opp. 56.1 ¶ 39A, and traveling overseas to visit manufacturers with which RTA had a relationship, see Pl. 56.1 ¶¶ 10, 35; Def. Opp. 56.1 ¶¶ 10A, 35A.  It appears that over time, Riley and Temkin disagreed over whether she would be granted control and/or ownership of certain aspects of RTA's business.  Compare Pl. 56.1 ¶ 16 ("Defendant Riley believed she was entitled, and demanded, ownership of certain aspects of Plaintiffs' companies [sic].") with Def. Opp. 56.1 ¶ 16A ("[P]laintiffs' principal Robert Temkin assured defendant Riley that she would be permitted to control and run whatever business she built while working for RTA, upon which assurance Ms. Riley relied in continuing employment with RTA.  Later, Mr. Temkin reneged on his agreement. . . .").  On June 5, 2005, Riley submitted her resignation to B.U.S.A. and RTA, and her resignation became effective the following day.  Def. 56.1 ¶ 31; Pl. Opp. 56.1 ¶ 31.

Plaintiffs allege that prior to, at the time of, and immediately following her resignation, Riley engaged in misappropriation of its trade secrets and other wrongful acts. Plaintiffs' allegations of specific wrongdoing date back to as early as September 2003, when a list of potential names for a new glove venture was circulated.  Pl. 56.1 ¶ 17; Def. Opp. 56.1 ¶ 17A. Although the parties dispute the nature of this new venture and to what extent plaintiffs ever intended to pursue it, see Pl. 56.1 ¶ 17;

Def. Opp. 56.1 ¶ 17A, it is undisputed that one of the names on the list was "EcoGlove" or "Ecogloves," Pl. 56.1 ¶ 17; Def. Opp. 56.1 ¶ 17A, and that at some point thereafter (in August 2004, according to plaintiffs) Riley registered the domain name "www.ecogloves.com," Pl. 56.1 ¶ 18; Def. Opp. 56.1 ¶ 18A.  Plaintiffs contend that while still employed with them, Riley initiated discussions with one of plaintiffs' manufacturers, a company called Shengda in China, about developing gloves for her own business.  Pl. 56.1 ¶ 33.  (Riley disputes this.  See Def. Opp. 56.1 ¶¶ 33A-33B.)  Plaintiffs also allege, and defendants do not directly dispute, that prior to her resignation, Riley began using the email address "lynn@ecogloves.com" to communicate with certain suppliers.  See Pl. 56.1 ¶ 19; Def. Opp. 56.1 ¶ 19A.  Cf. Plaintiffs' Appendix of Exhibits in Support of Their Motion for Summary Judgment ("Pl. Appx.") at A1166-A1547.[3]

On June 7, 2005, the day after her resignation became effective, Riley filed incorporation papers with the Secretary of

_____

[3] Defendants have made repeated, across-the-board objections to plaintiffs' reliance on any of the materials contained in this appendix because plaintiffs have offered no declaration, affidavit, or other attestation of the admissibility of the documents contained therein.  See, e.g., Def. Opp. 56.1 ¶ 1B. Plaintiffs' overarching failure to provide a proper attestation of the admissibility of the materials is not necessarily grounds to exclude them all, as particular documents may be admissible under, for example, Fed. R. Evid. 901(b)(4) (authentication by "distinctive characteristics and the like") or Fed. R. Evid. 902 (self-authentication), see Commercial Data Servers Inc. v. IBM Corp., 262 F. Supp. 2d 50, 60 (S.D.N.Y. 2003).  In any event, the Court will address the authenticity and admissibility of the individual documents contained in the appendix where those documents are relevant to its analysis.  Here, the issue is immaterial, as the Court's ruling does not turn on whether or not Riley used the "lynn@ecogloves.com" email address.

State of New York to form her own company called EcoGloves, Inc., Pl. 56.1 ¶ 24; Def. Opp. 56.1 ¶ 24A, and she thereupon began to compete in the glove supply industry, <u>see</u> Pl. 56.1 ¶ 27; Def. Opp. 56.1 ¶ 27A.  Plaintiffs contend that Riley immediately began using information she had access to only by virtue of having been employed by plaintiffs (including their customer contact lists and access to plaintiffs' manufacturers) in order to compete against them.  <u>See</u> Pl. 56.1 ¶¶ 51-68.

Plaintiffs specifically contend that they lost at least one account – the Clairol "Nice 'N Easy" account – because of Riley's actions.  <u>See</u> Pl. 56.1 ¶¶ 39-50.  Although Riley disputes the term "account," <u>see</u> Def. Opp. 56.1 ¶ 39A, it is undisputed that during the time Riley worked for plaintiffs, plaintiffs supplied products to Clairol for its Nice 'N Easy line of products.  Pl. 56.1 ¶¶ 39-40; Def. Opp. 56.1 ¶¶ 39-40.  At some time in 2005 prior to Riley's resignation from B.U.S.A./RTA, Clairol sought a new bid from plaintiffs for its Nice 'N Easy business.  <u>See</u> Pl. 56.1 ¶¶ 41-45; Def. Opp. 56.1 ¶¶ 41A-45C.  Plaintiffs allege that Clairol requested that plaintiffs lower their price and reduce their lead time and that Riley never disclosed these demands to plaintiffs and refused to meet Clairo's requirements, Pl. 56.1 ¶¶ 41-44, while Riley maintains that Clairol sought a new bid and that she attempted to work with Temkin to present such a bid, Def. Opp. 56.1 ¶¶ 41A-45C, but in the event the bid was rejected and Clairol went with a different supplier, <u>see</u> Pl. 56.1 ¶ 45; Def. Opp. 56.1 ¶ 45A.

In addition, plaintiffs allege that, literally on the eve of her departure (on June 5, 2005), Riley committed several acts that amount to computer fraud.  The Complaint alleges that Riley accessed information in plaintiffs' computer systems without authorization, obtained trade secret information, copied trade secret information, and removed certain files from plaintiffs' computer systems, Compl. ¶¶ 73-74, in addition to damaging a laptop computer that she had been using so that it became "unworkable," id. ¶ 77.  The evidence of what Riley actually did in this regard is, however, sketchy.  Specifically, plaintiffs allege that Riley copied "thousands" of emails into a folder on her workplace desktop entitled "PSTs to Make into CDS," and then copied the emails onto removable discs.  Pl. 56.1 ¶¶ 69-70.  In support of this contention, however, they point only, see id., to an image that purports to be a screen shot of Riley's desktop, Pl. Appx. at A863, the authenticity of which cannot be verified, and to portions of the Amended Expert Report of Guy Austrian, id. at A1936-37, which report was excluded from evidence in its entirety, see tr. 9/10/07 (Magistrate Judge Fox's ruling); Minute Entry 9/26/07 (Judge Robinson's affirmation of Magistrate Judge Fox's ruling).  Plaintiffs further allege that Riley encrypted these files so that they were only accessible with a password, Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment ("Pl. Opp. Mem.") at 5, but here the only evidence to which plaintiffs point is a declaration made by Robert Temkin at the time that the parties moved for summary judgment, see Declaration of Robert Temkin dated June 26, 2007 ("Temkin Decl.") ¶ 17.  Temkin states that

"[t]hese files were each separately password protected" without explaining the basis for his knowledge of this alleged fact.  <u>Id.</u>

These and other evidentiary gaps will be discussed further below.  In any case, on the basis of these alleged events, plaintiffs brought the various claims asserted in this action, including the two federal claims under the CFAA and RICO respectively.  The Court finds, however, that neither of these federal-law claims withstands defendants' motion for summary judgment.

The Court turns first to plaintiffs' civil RICO claim. Plaintiffs, bringing suit pursuant to 18 U.S.C. § 1964(c), allege that defendants have violated 18 U.S.C. § 1962(b) and/or (c) by maintaining an interest in an enterprise, or conducting an enterprise's affairs, through a pattern of racketeering activity.  In order to establish a pattern of racketeering activity, plaintiffs must, first, prove that defendants committed at least two acts of racketeering activity as defined in 18 U.S.C. § 1961(1) within a ten-year period.  18 U.S.C. § 1961(5).  The Supreme Court has further held that in order to establish a pattern, "continuity" among the predicate acts over time must be shown – in other words, as the Court explained, "it must . . . be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, <u>continuing</u> racketeering activity."  <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 240 (1989) (emphasis in original).  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."  <u>Id.</u> at 242.

Plaintiffs point to such acts as registering the www.ecogloves.com domain name and the numerous emails and phone calls that Riley allegedly sent or made to competitors immediately upon resigning as instances of mail or wire fraud because Riley, by undertaking these acts, was breaching her fiduciary duty and/or trading on misappropriated trade secret information.  Defendants dispute that these acts can be accurately characterized as mail or wire fraud, but even assuming, arguendo, that they can be, plaintiffs still fail to make out a civil RICO claim.

Since the Supreme Court decided H.J. Inc., the Second Circuit has elaborated on what is required to establish "continuity" and so satisfy the pattern requirement of a RICO claim.  In GICC Capital Corp. v. Technology Finance Group, 67 F.3d 463 (2d Cir. 1995), the Second Circuit explained that

> a plaintiff in a RICO action must allege either an "open-ended" pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a "closed-ended" pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time).

Id. at 466 (quotation marks omitted).  Neither type of pattern is plausibly established by the facts upon which plaintiffs rely. Specifically, plaintiffs point to 1) Riley's registration of the www.ecogloves.com domain name in August 2004; 2) emails sent from the "lynn@ecogloves.com" address to plaintiffs' suppliers between January and November 2005, allegedly soliciting the suppliers' involvement in

Riley's competing business, <u>see</u> Pl. Appx. at A591-93, A1166-1547[4]; 3) emails between Riley and employees of such companies as Proctor and Gamble and L'Oreal that show her, beginning on the day of her resignation and continuing through November 2005, soliciting business from them, <u>see, e.g., id.</u> at A1918, A1598-1801.[5]

Even on the most generous interpretation, these acts do not amount to an "open-ended" or a "closed-ended" pattern of racketeering activity.  A "closed-ended" pattern must extend over a "substantial period of time," and "[s]ince the Supreme Court decided H.J., Inc., [the Second Circuit] has never held a period of less than two years to constitute a 'substantial period of time.'" <u>DeFalco v. Bernas</u>, 244 F.3d 286, 321 (2d Cir. 2001).  The span of time over which Riley's supposed wrongdoings took place here is, at most, less than a year and a half (from August 2004 to November 2005).

As for an "open-ended" pattern, under <u>GICC Capital</u>, "an inherently unlawful act performed at the behest of an enterprise whose business is racketeering activity would automatically give rise to the requisite threat of continuity" to establish an "open-ended" pattern, whereas if "the nature of conduct or the enterprise does not by itself suggest that the racketeering acts will continue," the court must look at "other external factors."  67 F.3d at 466.  None of the circumstances here present suggests that defendants are or

---

[4] Although these emails, as noted above, have not been authenticated, the Court assumes for the sake of argument that they are authentic, admissible evidence.

[5] Again, the Court assumes for the sake of argument that these documents are authentic, admissible evidence.

were likely to engage in future racketeering acts; Riley's alleged
wrongdoings were directed at a single victim (or two closely-related
victims, depending on whether B.U.S.A. and RTA are or are not both in
the glove business) and had a single purpose (to start her own
business and – purportedly wrongfully – compete with her former
employers).  See Medinol Ltd. v. Boston Scientific Corp., 346 F.
Supp. 2d 575, 613 (S.D.N.Y. 2004) ("Courts have uniformly and
consistently held that schemes involving a single, narrow purpose and
one or few participants directed towards a single victim do not
satisfy the RICO requirement of a closed or open pattern of
continuity.") (citing Lefkowitz v. Bank of New York, No. 01 Civ.
6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003).  Accordingly,
the Court finds that summary judgment in defendants' favor on
plaintiffs' civil RICO claim is appropriate.

        Plaintiffs' CFAA claim fares no better.  The CFAA, 18 U.S.C.
§ 1030, criminalizes certain instances of unauthorized access to or
unauthorized use of a computer.  The statute also provides a civil
right of action for "[a]ny person who suffers damage or loss by
reason of a violation of this section."  18 U.S.C. § 1030(g).  As an
initial matter, the Court notes that, as described above, the
evidence showing that Riley "knowingly accessed a computer without
authorization or exceeding authorized access," 18 U.S.C. §
1030(a)(1), is threadbare.  The only arguably admissible evidence
cited by plaintiffs showing that Riley copied or encrypted computer

files at all is Temkin's June 26, 2007 declaration.[6]  Moreover, under the statute, "exceeding authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  In support of their contention that Riley obtained or altered information that she was not entitled to obtain or alter, plaintiffs (once again) rely on Guy Austrian's excluded expert witness report and Temkin's declaration, see Pl. Opp. Mem. at 5, but Temkin's declaration does not describe the extent of Riley's authorized use of plaintiffs' computer systems, nor does it specify how she went beyond the scope of this use, see Temkin Decl. ¶¶ 14, 17.

Even leaving these failings aside, moreover, plaintiffs have failed to marshal admissible evidence that would show that they have met the jurisdictional threshold for damages under the CFAA.  The CFAA specifies that a civil action may only be brought if the unauthorized access causes, inter alia, "loss to 1 or more persons

---

[6] The Court does note that, in Temkin's deposition, he described files that had been copied into

a folder that described – I don't remember the exact word. It was something to be copied, you know, onto media or CD or DVD, and there was a little confustion at that time because I thought [Guy Austrian] meant he found the folder but it was empty, but, eventually, it turned out there was, actually, all this material in there but it was password-protected or something, and it was a gigantic amount of material. . . .

Deposition of Robert I. Temkin, Ex. G to Reply Declaration of Charlotte G. Swift, Esq. at 292.  This testimony is not cited in plaintiffs' 56.1 statement, opposition 56.1 statement, or other submissions.

during any 1-year period . . . aggregating at least $5,000 in value."

18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I).  The statute, in turn,

defines "loss" as

> any reasonable cost to any victim, including the cost of
> responding to an offense, conducting a damage assessment, and
> restoring the data, program, system, or information to its
> condition prior to the offense, and any revenue lost, cost
> incurred, or other consequential damages incurred because of
> interruption of service.

18 U.S.C. § 1030(e)(11).  Courts in the Southern District of New York

have interpreted "loss" narrowly, rejecting arguments, for example,

that it includes the economic value of consumers' attention, In re

Doubleclick Inc. Privacy Litigation, 154 F. Supp. 2d 497, 524-25

(S.D.N.Y. 2001), that it includes the cost of business trips

undertaken to respond to a computer hacking incident, Nexans Wires

S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 473-76 (S.D.N.Y. 2004),

aff'd by summary order, 166 Fed. Appx. 559 (2d Cir. 2006), or that it

includes lost profits that are not attributable to an "interruption

of service," id. at 477-78.

Plaintiffs point to three kinds of loss that they allegedly

suffered as a result of Riley's actions: 1) money paid to Guy

Austrian, plaintiffs' retained computer support person as well as,

later, their purported expert witness ; 2) the cost of time spent by

other of plaintiffs' employees attempting to restore files and

recreate records; and 3) revenue that was lost because of the loss of

data.  There are significant difficulties with each of these.

With regard to money paid to Guy Austrian, plaintiffs point,

first, to invoices dated June 17, 2005 and November 16, 2005 charging

plaintiffs $1025 and $1850, respectively, for "forensic analysis."

Exs. A and B to Declaration of Guy Austrian dated July 23, 2007

("Austrian Decl."). Austrian testified at his deposition, however,

that he was retained as an expert witness "in the vicinity of Ms.

Riley's departure," Deposition of Guy Austrian ("Austrian Dep."), Ex.

H to Reply Declaration of Charlotte G. Swift, Esq. ("Swift Decl."),

at 32, and that these amounts were billed for his service as an

expert witness.  Specifically, his testimony reads,

> Q: So, the work that you performed, forensically, was a
> consequence of your being hired as an expert witness,
> correct?
>
> A: That's correct.

Id. at 34.  It then continues,

> Q: The third invoice for $1,025, does that relate to your
> work for the plaintiff as an expert?.
>
> A: Yes, it does.

Id. at 37.  It again continues,

> Q: Now, here, I see an invoice for $1,850.00 -
>
> A: Yes.
>
> Q: - for forensic analysis, 11/16/05; do you see that?
>
> A: Yes, I do.
>
> . . .
>
> Q: Well, you've testified already that the forensic analysis
> conducted June 7th through June 17th . . . was in connection
> with you being retained as an expert witness.  I'm asking you
> whether this, also, where it says forensic analysis was of a
> similar nature?
>
> A: Yes.

<u>Id.</u> at 47-48.  Nowhere does the law indicate, and plaintiffs do not attempt to argue, that the cost of hiring an expert witness qualifies as a "loss" under the CFAA.

Plaintiffs, instead, argue that these amounts were in fact billed by Austrian for "investigation, recovery, and security efforts . . . as a result of Riley's unlawful acts."  Pl. Opp. Mem. at 9. They rely on a declaration sworn by Austrian in July 2007 (in other words, at the time that plaintiffs filed their opposition papers to defendants' motion for summary judgment) in which he states that the invoices for $1025 and $1850 were for work that

> involved investigating and remedying the damage caused by Riley, including work performed related to restoring deleted files, and decoding approximately 5 gigabytes of password encrypted files as well as restoring certain security measures to Plaintiffs' network.

Austrian Decl. ¶¶ 8, 10.  However, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  <u>Hayes v. New York City Dept. of Corrections</u>, 84 F.3d 614, 619 (2d Cir. 1996).  After Austrian testified at his sworn deposition that these invoices were for his services as an expert witness, plaintiffs cannot create an issue of fact by introducing Austrian's declaration to the contrary with their opposition papers.

Plaintiffs also claim, with regard to Austrian's services, that a portion of his $16,000 annual fee for "consulting services," <u>see</u> Ex. C to Austrian Decl., is attributable to Riley's misdeeds. Austrian testified at his deposition that he charged plaintiffs

$16,000 per year as a flat fee for his services providing computer support.  Austrian Dep. at 41-44.  He further testified that while a portion of his time in the relevant year was spent investigating Riley and the effects of her actions on plaintiffs' computer systems, id. at 44-45, "there's no way to tell" what portion of his annual fee is attributable to those efforts "because it was a flat agreement," id. at 45.  In his declaration submitted with plaintiffs' opposition papers, however, he once again contradicts (or supplements) his prior testimony, stating that

> [i]n addition to the work and 11.5 hours described in paragraphs 8 and 10 that I performed for Plaintiffs following Riley's resignation, I also performed, at the very least, 12 hours of work in connection with investigating and remedying the damage caused by Riley, including work performed related to restoring deleted files, and decoding approximately 5 gigabytes of password encrypted files as well as restoring certain security measures to Plaintiffs' network.

Austrian Decl. ¶ 13.  He further stated that these "12 hours . . . were billed to Plaintiffs as part of the $16,000 annual fee," id. ¶ 14, and that his hourly rate is typically $250, id. ¶ 6.

Plaintiffs would have it that this means that $3,000 (or 12 hours at $250/hour) of his $16,000 annual fee counts as "loss" under the CFAA.  See Pl. Opp. Mem. at 10.  Once again, however, this effort to, "by omission or addition, contradict[] the affiant's previous deposition testimony," Hayes, 84 F.3d at 619, and so create a material issue of fact, must be rejected.  Moreover, even if one were to accept for the purpose of this motion practice Austrian's assertion that he worked 12 additional hours addressing computer problems created by Riley, the calculation that this amounts to a

loss of $3,000 is flawed.  Austrian did not bill plaintiffs at
$250/hour for this work; he billed them at $16,000/year, and so the
amount attributable to any given item cannot really be calculated or
is effectively zero.  Alternatively, in order to figure out how much
of his fee can even arguably be considered a "loss" within the
meaning of the CFAA, one would need to know how many hours per year
he worked and then determine what fraction of that total 12 hours
amounts to.  There is no evidence in the record that allows this
calculation to be done with any confidence.  Nor can it reasonably be
inferred that at least $3,000 of the yearly fee counts as "loss."
One would have to assume that Austrian worked a total of only 64
hours in his entire year of providing service for plaintiffs in order
to attribute $3,000 worth of work to efforts to repair problems
caused by Riley.  Put differently, to accept plaintiff's calculation
one would have to assume that Austrian's efforts to address problems
caused by Riley took up 18.5%, or almost a fifth, of his total time
for the year.

      Next, plaintiffs assert that their employees "expended
hundreds of hours attempting to restore the crucial business files
that Riley deleted."  Pl. Opp. Mem. at 11.  Plaintiffs calculate that
at an average billable rate of $33.85 per hour, this means that at
least $6,770 was lost as a result of Riley's actions.  Id. at 12.
The purported basis for these assertions is a declaration introduced
with plaintiffs' opposition papers – here, Temkin's.  He states that

> Plaintiffs' employees . . . spent many hours trying to
> re-create, as well as locate, from other less convenient

sources, the information contained in the deleted and
encrypted files.

Temkin Decl. ¶ 6.  And he states that

> [c]umulatively, Plaintiffs' employees Thibaut Tenaille, Vicki
> Funchun, Kimberly Hicks, Christina Lourenco, and Sharon Knock
> spent no less than 200 hours investigating, locating, and
> recreating the files and information that had been deleted,
> moved and encrypted, including information pertaining to
> customer contacts, shipping schedules, inventory sheets, and
> other vital information. . . .

Id. ¶ 7. (He also provides information regarding the average annual

salaries and average billable rates of these employees, see id. ¶ 9.)

No foundation for this testimony – in the form of, for example, an

account of how these employees' hours were tracked – is offered.

Moreover, once again plaintiffs attempt to introduce a declaration

with their summary judgment papers to contradict prior sworn

deposition testimony.  At his deposition, Temkin testified that his

employees

> had to go and try to rebuild all of the supply chain that was
> coming in, all of the orders on hand, all the items that were
> in the process of approval. . . .  So, the damages, the
> amount of energy in rebuilding that everyone had to go
> through because we didn't know where to start.

Deposition of Robert Temkin ("Temkin Dep."), Ex. G to Swift Decl., at

293.  But when asked, "[w]ould you be able to quantify them in any

way, whatsoever?" he stated, "I would not be able to quantify them in

a dollar amount."  Id.

Finally, plaintiffs argue that they lost the Clairol "Nice 'N

Easy" account, worth $165,653.00, because of Riley's interference

with their computers.  As recounted above, before her departure Riley

prepared and submitted a bid to Clairol in her capacity as manager

for the plaintiff companies, but this bid was allegedly rejected because Clairol demanded a shortened lead time for delivery and Riley informed them that this request could not be accommodated.  Shortly after her departure, plaintiffs submitted a second bid, but they did not win back the account, a failure they attribute to the fact that they did not have access to Riley's emails in which she discussed the request for a shortened lead time with Clairol.  See Pl. Opp. 56.1 ¶¶ 37-39.

Under the CFAA, however, lost revenue only qualifies as "loss" if it is "revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  The credible evidence in the record does not show that Riley's actions caused an "interruption of service" – at most, plaintiffs were unable to access some of her past emails for an unspecified period of time.  And at any rate, the chain of causation posited by plaintiffs is far too attenuated for the loss of the Nice 'N Easy account to be considered "because of" such an interruption. Plaintiffs' argument asks the Court to assume that if Riley had not taken the actions alleged, plaintiffs would have 1) searched her emails, 2) found the emails from Clairol asking for shorter lead time, 3) formulated a bid providing such shortened lead time, and 4) succeeded in underbidding the competition.

In addition to the other weaknesses in their CFAA claim, then, plaintiffs have failed to adduce admissible evidence that would show that they suffered $5,000 in "loss" in order to satisfy the

jurisdictional damages threshold of the CFAA.  Accordingly, defendants' motion for summary judgment on this claim is granted.

Because the Court finds that summary judgment dismissing plaintiffs' two federal-law claims is required, the question arises whether the Court should, in its discretion, retain jurisdiction over plaintiffs' remaining state-law claims, see 28 U.S.C. § 1367(c)(3) ("The district [court] may decline to exercise supplemental jurisdiction . . . if . . . [it] has dismissed all claims over which it has original jurisdiction.") In making this determination, the court "must reassess its jurisdiction over the case by considering several related factors – judicial economy, convenience, fairness, and comity." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004).  In particular, dismissal may be appropriate where "the state claim[s] substantially predominate[] over the [now-dismissed] claim[s] over which the court has original jurisdiction." Seabrook v. Jacobson, 153 F.3d 70, 71 (2d Cir. 1998).  Here, that is undoubtedly the case.  The state law claims predominate not only in number but in the sense that the true gravamen of this action is defendants' alleged misappropriation of trade secrets and wrongful competition with plaintiffs, which are a matter of state law.  Nor are plaintiffs' arguments that the time and effort they have expended on this litigation render it less than fair to dismiss this action entitled to any weight when, as the record amply shows, they have

thrown up repeated obstacles to its orderly and efficient resolution.[7]

Accordingly, the Court finds that dismissal of this action is appropriate.  The Court therefore does not reach plaintiffs' motion for summary judgment.

For all of the foregoing reasons, the Court hereby grants defendants' motion for summary judgment and dismisses Count 1 and Count 7 of plaintiffs' complaint with prejudice.  The remaining counts are dismissed, without prejudice, for lack of federal jurisdiction.

The Clerk of the Court is ordered to close entry number 55 on the docket and to enter final judgment dismissing the case.

SO ORDERED.

Dated: New York, NY
       September 26, 2009

JED S. RAKOFF, U.S.D.J.

---

[7] To give one significant example, plaintiffs were repeatedly disciplined by Magistrate Judge Fox for their evasive and obstructionist behavior during discovery.  At one stage, 178,000 pages of documents produced by plaintiffs were excluded from evidence because Judge Fox found that plaintiffs had ignored his specific directives and failed to adequately sort and identify the documents in an effort to "simply overwhelm defense counsel with irrelevant documents."  Tr. 5/4/07.  At another stage, Judge Fox ordered a second round of depositions by defendants in light of plaintiffs' "inexcusable" failure to produce 6,500 pages of documents that defendants had requested. Tr. 3/20/07.